FILED
2014 Sep-29  PM 03:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| VOLCANO ENTERPRISES, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-13-S-505-NE |
| | ) | |
| THE CITY OF HUNTSVILLE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This action was commenced in the Circuit Court for Madison County, Alabama, on February 14, 2013, and removed here on March 15, 2013.[1]  The plaintiffs are Volcano Enterprises, Inc., doing business as "Volcano 256," and its majority stockholder, Daryl Williams.[2]  They seek judicial review of the denial of their application for a liquor license by the Huntsville City Council by means of a petition for common-law writ of *certiorari*.  They also assert a claim for damages under 42 U.S.C. §§ 1981 and 1983.[3]  The case now is before the court on defendant's motion for summary judgment.[4]  Upon consideration of the pleadings, briefs, and oral

---

[1] Doc. no. 1 (Notice of Removal).

[2] Doc. no. 7 (Amended Complaint), ¶¶ 1–2.  Williams owns a ninety-percent share of Volcano 256.  *See* doc. no. 28-3 (Williams Deposition), at 22.

[3] *See* doc. no. 7 (Amended Complaint), ¶¶ 26–34.

[4] *See* doc. no. 26 (Motion for Summary Judgment).

arguments of counsel, the court concludes the motion should be granted.[5]

## I. FACTS

Daryl Williams is an African-American resident of Birmingham, Alabama, who owns and operates an adult lounge ("Club Volcano") within that city.[6]  He leased

---

[5] Summary judgment should be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings, and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, to designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324. Any reasonable dispute or doubt as to a material fact, and all justifiable inferences, are resolved in favor of the non-moving party.  *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The materiality of a fact is determined by the substantive law at issue.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A "genuine" dispute is one in which a reasonable jury could find for the non-moving party.  *Id.*

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

[6] *See* doc. no. 28-3 (Williams Deposition), at 6, 27; doc. no. 21-2 (Oct. 25, 2012 Council Minutes: pages 1–15 of 32), at ECF 15.  **NOTE WELL:**  "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically.  *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header."  *Wilson v. Fullwood*, 772

space located in a business plaza at 4320 University Drive in Huntsville ("the subject property") on February 1, 2011,[7] with the intention of opening another adult lounge to be named "Volcano 256."[8]   Other tenants occupying spaces within the same business plaza included a liquor store, an adult bookstore, and the "Cat and Mouse Club" (which was owned by a Caucasian).[9]

A club named "The Silver Dollar Lounge" had occupied the subject property for more than thirty years before Williams leased the same space.[10]   It opened for business on some undisclosed date in the 1970s, and closed on December 31, 2010.[11] During its years of operation, the Silver Dollar Lounge served alcohol and featured female dancers.[12]   Its owners were Caucasian.[13]

---

F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)). Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[7] *See* doc. no. 21-1 ("LEASE AGREEMENT" between Danny Johnson and Volcano Enterprises), at ECF 31.

[8] Doc. no. 21-1 ("City of Huntsville Alcoholic Beverage License Supplemental Application"), at ECF 26.

[9] *See* doc. no. 28-3 (Williams Deposition), at 141; doc. no. 21-2 (License Review Committee Minutes), at ECF 22; doc. no. 21-6 (Dec. 6, 2012 Council Minutes), at ECF 5.

[10] Doc. no. 21-2 (License Review Committee Minutes), at ECF 13.

[11] *See* doc. no. 21-1 ("City of Huntsville Alcoholic Beverage License Supplemental Application"), at ECF 26; doc. no. 21-2 (License Review Committee Minutes), at ECF 13.

[12] *See* doc. no. 28-3 (Williams Deposition), at 112; doc. no. 21-1 ("City of Huntsville Alcoholic Beverage License Supplemental Application"), at ECF 27.

[13] Doc. no. 28-3 (Williams Deposition), at 134.

Williams leased the subject property with the intention of operating the "exact same business as Silver Dollar did."[14]  Thus, his August 15, 2012 application sought the same classification of liquor license previously held by the owners of the Silver Dollar:  *i.e.*, "Lounge Retail (With Entertainment)."[15]

A.   **The License Review Committee's Decision**

Huntsville's ordinances vest the members of a License Review Committee with the responsibility of assisting the City Council in reviewing and investigating liquor license applications.

> There is created, for the purpose of assisting the city council in reviewing and approving applications for licenses and performing other matters specifically assigned to the committee by this chapter, a committee to be known as the license review committee.  The committee shall assist the city council in the consideration and special investigation of all applications for licensing under this chapter.  The committee shall be composed of the city clerk-treasurer or an administrative officer of the clerk-treasurer's office designated by the city clerk-treasurer; the chief of police or an officer of the police department designated by the

---

[14]*Id.* at 114.

[15] *See* doc. no. 21-1 ("City of Huntsville Alcoholic Beverage License Supplemental Application"), at ECF 29.  *See also*, *e.g.*, *id*. at ECF 26 ("City of Huntsville, Alabama Supplemental Privilege License Application Approval for Alcoholic Beverage"), stating in the "REMARKS/COMMENTS" portion at the bottom of the page:

> The applicant would like for the City of Huntsville to approve a Lounge Retail Liquor with entertainment license at this location.  This location held a 2010 license for this same classification under the name R G Entertainment Inc. #8692 d/b/a Silver Dollar.  This establishment closed December 31, 2010.  This same applicant was denied this license 4/19/12 for being within 500 ft of a residential zone.

chief of police; and the director of planning or an employee of the planning department designated by the director of planning.

HUNTSVILLE, ALA., ORDINANCE NO. 11-654, § 3-87(a) (2011).[16]  The factors to be

considered when reviewing an application were listed as follows:

(a) In considering the application for a city license, whether by the liquor license review committee or the city council on appeal, all relevant factors may be considered, which includes, among others and without limitation, the following:

(1) Compliance with this chapter and the state alcoholic beverage control laws, which includes classification specific requirements or qualifications for licensing;

(2) Compliance with other city ordinances, rules, and regulations, which includes the city's zoning laws and any variances or special exceptions granted pursuant thereto;

(3) Suitability of the applicant and persons having ownership, control, or management of or an interest in the establishment to be licensed;

(4) Any required security plan and suitability of security personnel;

(5) Location of the premises, which includes adjacent or nearby uses;

(6) Information contained in the application, which includes criminal history;

(7) Results of the investigation conducted in accordance with section 3-86;

---

[16] *See also* doc. no. 21-1, at ECF 14.

(8) Testimony presented at any hearings conducted on the application, which includes testimony of the owners or occupants of nearby property as well as the general public; and

(9) Impact upon the welfare, health, peace, temperance, morals, and safety of the public.

(b) In an appeal to the city council, the city council may consider the decision of the license review committee and any reasons given therefor.

(c) No applicant shall be deemed eligible for a license under this chapter nor shall an application be approved without having first obtained all required permits from the health department, and without fully meeting applicable requirements of the technical codes of the city, the fire prevention codes of the state and of the city, the zoning laws of the city, and other applicable city laws which regulate the business or the premises.

*Id.*, § 3-89.[17]

Sergeant Mark Roberts, who had represented the Chief of Police on the License Review Committee for more than a decade, was present at the September 20, 2012 meeting when plaintiffs' application was discussed.[18]  He had conducted the required investigation into the application.[19]  The minutes record the following discussion:

The application for Volcano was read by Chairman Cole and turned over to Sergeant Roberts for his comments.  He stated this application had come up for the third time.  The first time it was denied

---

[17] *See also id.* at ECF 14-15.

[18] Doc. no. 28-2 (Roberts Deposition), at 12; doc. no. 21-1 (License Review Committee Minutes), at ECF 79–85.

[19] Doc. no. 28-2 (Roberts Deposition), at 44, 54.

6

on 9-1-11 by the Fire Department.  On 4-19-12 it was denied by the Zoning Department, and on 8-15-12 it was submitted again.  On this date it was denied again and Sergeant Roberts stated that he would give a history but Mr. Lucian Blankenship, attorney for the applicant, Mr. Williams, stated Mr. Williams was not present at this time but was en[-] route and was caught up in traffic.   Whereupon, Chairman Cole proceeded with the other business and came back to this application last with Mr. Williams still not present.

. . . .

[Between the foregoing entry in the Committee's minutes and the following report by Sergeant Mark Roberts, two persons appeared before the Committee and spoke in favor of Williams's application, but neither individual indicated that he lived (or worked) in the area near the property.[20]]

Sergeant Roberts stated the application was denied regarding the impact of the area and the history on the site activity at 4320A University Drive.

Sergeant Roberts further stated on March 25, 2011 Huntsville Police found employees from Birmingham doing construction work and not licensed, and they were bootlegging electricity.  The police brought in the landlord, and he was advised and agreed he would lock up everything until it was all taken care of.

On 3-31-11 doors were open and Mr. Williams was inside and still had no license, and the Inspection Department issued a Stop Work Order.

On 4-26-11 the police get a call and find several workers inside doing demolition, and these were employees again from Birmingham

---

[20] Doc. no. 21-1 (License Review Committee Minutes), at ECF 80-81.  The two individuals who appeared were Mr. Wiley Nunn (who described himself as the "host of a tv show, ['] Showcase', owner of a small business, and supporter of 'Tools For Teachers'") and Mr. Cedric McDaniel (who described himself as having "a tv show called 'Mixed Shows', and . . . a DJ").

with no license and permit.  Two workers were arrested and pled guilty, and Mr. Williams pled guilty to violation of the City Code.  One worker possessed a handgun and drugs and is on the run for 2 outstanding arrest warrants pending failure to appear on charges of possession of marijuana and drug paraphernalia.

On 5-2-11 the Inspection Department issued a second Stop-Work Order which was ignored.

On 5-8-06 Mr. Williams was arrested for felony drug charges.

An impact study on what adult entertainment brings to a place was done, and the police were able to do calls on full impact to this one particular area.  From calls to the police from 12-21-08 to 10-21-10 in the shopping center only which comprised a 22 month period, there were 87 incidents and 49 of them occurred at or were related to customers at The Silver Dollar Lounge.  32 of those crimes were drug related.  The Silver Dollar Lounge was open at the time and this is 56% of the total incidents.  There were 529 service calls to the shopping center premises when the club was open and 4,709 calls for service to the general area.  From 10-21-08 to 8-21-12 which also comprises a 22 month period, there were 39 incidents at the same location.  Only 4 were drug related, and the Silver Dollar Lounge was closed during this time frame.  There were 142 service calls to the shopping center premises when the club was closed.  In the general area, like apartments, there was 3,452.  You can see the impact adult entertainment brings to the residents and shopping center involved.  There was nothing else except all were related to the adult club.

Mr. Blankenship stated Mr. Williams was arrested and charged and found not guilty, and he can pull this information.  He stated Mr. Williams never had any other history [of] problems.  He said Mr. Williams had operated his establishment, Club 205, for 15 years and had no history of any crime.  The police precinct is in the area, and Mr. Williams owns a number of businesses within the area.  At one time it was a high crime area until he came into the area.  He stated he couldn't speak for the past of the community and the public, but Mr. Williams

8

keeps down crime by not having people hanging outside, and he has off-duty police and a security firm and this keeps down loitering outside. He is preventive in keeping down crime.  He spoke to police in Birmingham also and can get facts from them.  Mr. Williams doesn't spend money unless he's concerned about this.  The police monitor him close and police are not concerned about him.  From an operating standpoint in regard to activity before, I understand you look strongly if he will be a business opportunity for the community.  The contractors he hired he was not familiar with, and they did not get permits and were caught in the club working without permits.  He doesn't know these people.

Sergeant Roberts stated these workers stated they were working for Mr. Williams. . . .

Doc. no. 21-1 (License Review Committee Minutes), at ECF 80–84 (alterations supplied).  At the conclusion of discussion, each member of the Committee wrote "Denied" next to his signature on the application form.[21]

## B.   The First City Council Hearing

Williams appealed the denial of his application to the Huntsville City Council.[22]  The issue first came up for discussion during the meeting held on October 25, 2012.[23]  Council President Mark Russell first recognized Dennis Cole, Chairman of the License Review Committee, who stated that

the applicant, Volcano Enterprises, Inc., had come before the Liquor License Review Committee three times, noting that they had applied for

---

[21] *See id.* at ECF 26.

[22] Doc. no. 21-1 (Notice of Appeal), at ECF 85.

[23] Doc. no. 21-2 (Oct. 25, 2012 Council Minutes: pages 1–15 of 32), at ECF 3, 7, 12.

a lounge retail liquor license at 4320 University Drive, and that they had been denied all three times.

Mr. Cole stated that on the first denial, on September 1, 2011, the Fire Department had recommended denial because of Fire Code violations; that on April 19, 2012, seven months later, the City of Huntsville Zoning Department had recommended denial based upon the grandfather clause; and that on September 20, 2012, five months later, the City of Huntsville Police Department had recommended denial, based in part on lounge impact on the surrounding area.

Mr. Cole stated that he had a petition from University Place Elementary School, from approximately 40 parents, asking the Council to deny Volcano Enterprises' appeal.

(Petition from parents of students attending University Place Elementary School, submitted by Tanya Newsom, Mom, PTA Parent, Leasing Specialist for Apartment Community.)

Doc. no. 21-2 (Oct. 25, 2012 Council Minutes: pages 1–15 of 32), at ECF 12–13.

After Chairman Cole submitted the petition signed by parents of students attending the University Place Elementary School, the Birmingham attorney for plaintiff Williams (Don Blankenship) stated that the issues which caused the first two denials of his client's application "had been resolved," and that his client had received a "Certificate of Occupancy."[24]  He argued that plaintiffs should "not be held responsible for what had happened at [The Silver Dollar Lounge]" during the years before Williams leased the subject property.[25]  He also questioned why, if the Silver

---

[24] *Id.* at ECF 13.

[25] *Id.* (alteration supplied).

10

Dollar Lounge had become a "nuisance," the City had not sought to close it.[26] Blankenship also questioned whether it was fair for the Police Department to attribute the "incidents" they reported to the Silver Dollar Lounge, as opposed to the "surrounding area," which "was on a major arterial street."[27] Finally, Blankenship stated that his client "had nothing in his background that would prevent him from owning a club."[28]

At the conclusion of Blankenship's statements, Sergeant Roberts presented substantially the same information he had reported to the License Review Committee, but added a few considerations.[29] For example, he pointed out that the University Place Elementary School referenced in the petition presented to the Council by Committee Chairman Cole was located "directly across the street" from the subject property.[30] He also noted that "approximately 1,000 apartments, completely

---

[26] *Id.*

[27] *Id.*

[28] *Id.* at ECF 14–15.

[29] *See* doc. no. 21-2 (Oct. 25, 2012 Council Minutes: pages 1–15 of 32), at ECF 15.

[30] *Id.* Daryl Williams alleged during his deposition that the school is *not* "directly across the street," but "over a mile away" from the subject property. Doc. no. 28-3 (Williams Deposition), at 200. According to this court's search on the "Google Maps" website, however, both Sergeant Roberts and Mr. Williams are incorrect. The school actually is 0.4 miles from Volcano 256 by automobile. Even so, the exact distance is not as important as the fact that the school is "nearby property" and, for that reason, the opinion of the parents of students who attended that elementary school became a relevant factor for consideration by members of the City Council. *See* HUNTSVILLE, ALA., ORDINANCE NO. 11-654, §§S 3-89(a)(5), (a)(8).

11

surround[] the location."[31]

Roberts then described a series of violations of the city's building codes that had occurred after Williams leased the subject property.[32]  The first occurred on March 25, 2011, when Roberts and another officer found workers performing demolition work for Williams without a license.[33]  The Police Department issued a "Stop Work Order," and warned Williams that he was required to obtain proper permits before performing construction work.[34]  Less than one week later, however, police officers again found contractors performing construction work on the premises, and issued a second Stop Work Order.[35]  On yet a third occasion, April 26, 2011, police officers found workers violating the Stop Work Orders, although Williams contends that he had hired the workers only to "clean up" the "mess" left by a contractor.[36]  Roberts reported that the workers "were jailed" after the third incident, and that Williams was later arrested "for operating without a license and a permit."[37]

---

[31] Doc. no. 21-2 (Oct. 25, 2012 Council Minutes: pages 1–15 of 32), at ECF 15 (alteration supplied).

[32] *Id.*

[33] *See id.*; doc. no. 28-2 (Roberts Deposition), at 24.

[34] Doc. no. 21-2 (Oct. 25, 2012 Council Minutes: pages 1–15 of 32), at ECF 15.

[35] *Id.*

[36] Doc. 28-3 (Williams Deposition), at 74.

[37] Doc. no. 21-2 (Oct. 25, 2012 Council Minutes: pages 1–15 of 32), at ECF 15.

Williams pled guilty to the charge of working without a permit.[38]

At one point during Sergeant Roberts's description of the third building code violation, Councilman Will Culver said that he "did not like the fact that they were exposing Mr. Williams'[s] business in a Council meeting, noting that he believed they should stay on the major issues."[39]   He explained that "he was more concerned about the crime that had been committed in the area, [and] that he did not want to make this a personal thing."[40]   In response, Sergeant Roberts stated that "the character of a person who owned a club that sold alcohol was part of the process of the liquor license application."[41]   *See* HUNTSVILLE, ALA., ORDINANCE NO. 11-654, § 3-89(a)(3) (directing the License Review Committee *and Council* to consider the "Suitability of the applicant").[42]

Roberts also presented an analysis of the impact of "adult entertainment" on the area surrounding the subject property during the years that the Silver Dollar Lounge had been in operation.[43]   According to police data, during the final twenty-

---

[38] *Id.*  Williams testified that he pled guilty to this charge because all he would "have to do is pay a fine."  Doc. no. 28-3 (Williams Deposition), at 96.

[39] Doc. no. 21-2 (Oct. 25, 2012 Council Minutes: pages 1–15 of 32), at ECF 15 (alteration supplied).

[40] *Id.* at 16 (alteration supplied).

[41] Doc. no. 21-2 (Oct. 25, 2012 Council Minutes: pages 1–15 of 32), at ECF 16.

[42] Doc. no. 21-1, at ECF 15.

[43] Doc. no. 21-2 (Oct. 25, 2012 Council Minutes: pages 1–15 of 32), at ECF 16–17.

13

two months the lounge was open for business, 49 of 87 "incidents" at the business plaza (*i.e.*, 56%) were "related to customers at the Silver Dollar Lounge,"[44] and 32 were drug-related (*i.e.*, 37% of 87 incidents, or 65% of 49 incidents).[45]  In contrast, during the twenty-two month period following the Silver Dollar's closure, the number of police "calls for service" in the business plaza had plunged 73% from the number of calls made during the final twenty-two months of the Lounge's operations:  *i.e.*, from 529 to 142 calls.[46]

Several persons present at the Council meeting spoke highly of Williams's character, challenged Roberts's findings, and asked the Council to grant the license.[47] Those persons included Wiley Nunn, a friend of Williams who did not indicate whether he lived or worked in Huntsville;[48] Shyheim Thompson, from Birmingham; and, Pastor T.C. Johnson, from Huntsville.[49]  On the other hand, Reverend Stan Mullins, pastor of Woodland Hill Baptist Church, "speaking on behalf of his church,"

---

[44] *Id.* at 17.

[45] *Id.* at 16.

[46] *Id.*

[47] Doc. no. 21-3 (Oct. 25, 2012 Council Minutes: pages 16–32 of 32), at ECF 17–20.

[48] *See supra* note 20.

[49] *Id.*  Pastor Johnson did not state the name or location of his church.  His comments primarily concerned the situation he believed the Council would create by denying the application, where "some persons could do some things in the city and others could not" (*i.e.*, referring to some persons being allowed to sell alcohol while others were not).  *Id.* at ECF 17.  He then said that "he was not saying that he was *for* this, that he was just dealing with a principle issue."  *Id.* (emphasis supplied).

14

asked the Council to deny the application, citing police efforts to reduce crime in the area.[50]   Mullins indicated that his church "was right around the corner from this location."[51]

Councilman Will Culver — who, like Williams, is an African-American, and who represented the district in which the subject property is located[52] — expressed a desire to consult residents within his district before voting on the issue.[53]   The Council then continued the hearing until its December 6, 2012 meeting.   Williams did not object.[54]

## C.   The Second City Council Hearing

The Council once again heard from Sergeant Mark Roberts during the second appeal hearing.[55]   He presented new statistics on the impact of adult entertainment businesses within the city,[56] and noted that, after two adult entertainment lounges on South Memorial Parkway had ceased operations, the number of police "incidents" in

---

[50] Doc. no. 21-2 (Oct. 25, 2012 Council Minutes: pages 1–15 of 32), at ECF 18.

[51] Id.

[52] Id. at ECF 23.

[53] Id. at ECF 24; doc. no. 21-3 (Oct. 25, 2012 Council Minutes: pages 16–32 of 32), at ECF 3.

[54] Doc. no. 21-3 (Oct. 25, 2012 Council Minutes: pages 16–32 of 32), at ECF 3.

[55] Doc. no. 21-3 (Dec. 6, 2012 Council Minutes: pages 1-9 of 38), at ECF 37.

[56] Id.

the vicinity of each closed club had decreased by 44% and 30%, respectively.[57]

A number of persons spoke for or against the application.  Reverend Stan Mullins, the pastor of the Woodland Hill Baptist Church, again argued for denial, saying that Williams did not "start off on the right foot" when remodeling the subject property.[58]  Doug Hale, the owner of 400 apartments near the subject property (and the former owner of an additional 460 apartment units located "right behind" the subject property) "strongly encourage[d]" the Council to deny the application.[59]  The parent of a University Place Elementary School student expressed concern over the fact that the club would be open "during after-school activities, such as PTA meetings."[60]  She also referred to Volcano 256 as "the strip club."[61]  Gaynell T. Beam argued against the licensing of what she also called "a strip joint."[62]  And, Paul Long complained that some persons who attended Councilman Culver's "Town Hall meeting" opposed the club because they "did not want any naked girls."[63]

At the close of the public comments portion of the hearing, City Attorney Peter

---

[57] *Id.* at ECF 37–38.

[58] Doc. no. 21-5 (Dec. 6, 2012 Council Minutes:  pages 15-19 of 38), at ECF 1.

[59] *Id.* at ECF 3 (alteration supplied).

[60] *Id.* at ECF 5.

[61] *Id.*

[62] Doc. no 21-4 (Dec. 6, 2012 Council Minutes: pages 10-14 of 38), at ECF 5.

[63] Doc. no. 21-5 (Dec. 6, 2012 Council Minutes: pages 15-19 of 38), at ECF 4.

Joffrion remarked that the statements by some speakers about the Silver Dollar Lounge operating as a "topless" or "strip club" were "not accurate," and he emphasized that the City of Huntsville did not permit such clubs.[64]

Council President Mark Russell then made a motion "to uphold the decision of the Liquor License Review Committee denying a retail liquor lounge entertainment license to Volcano Enterprises, Inc., dba Volcano 2[5]6,"[65] and Councilman Will Culver seconded the motion.[66]

During discussion on the motion, Councilman Bill Kling stated that he had attended numerous neighborhood association meetings, and that Williams's application "seemed to be the hot-button issue" during the meeting of the University Park/McThornmor Acres Neighborhood Association.[67] He observed that the persons within that neighborhood were most concerned about

> *noise*, *cut-through traffic*, *and crime*. He stated that after everyone had spoken, he had asked to get some feedback from [the persons in attendance]. *He stated that he had noticed in looking around the audience that it was certainly racially mixed.* He stated that he had asked for the consensus, everyone that was in favor and everyone that was opposed, and that the final result was that *34 persons who were in attendance at that meeting were opposed to the license being granted.*

---

[64] Doc. no. 21-6 (Dec. 6, 2012 Council Minutes: pages 20-34 of 38), at ECF 2 (emphasis and alteration supplied).

[65] *Id.* (alteration supplied).

[66] *Id.*

[67] *Id.* at ECF 3.

He stated that he believed there were one or two that had not raised their hands but that *no one was in favor of it*.[68]

Councilman Culver reported that a majority of the persons who attended his Town Hall meeting were opposed to granting plaintiffs a liquor license (*i.e.*, 55 opposed to 42 in favor).[69] He concluded by expressing regret that Daryl Williams had

> expended a lot of money and his liquor license had been denied by the Liquor Review Committee. He stated that, however, without regard to all of that, he represented the interests of the District and that he could not do anything differently with this particular situation than he had done with any of the aforementioned situations [in which applications had been denied].[70]

Councilman Richard Showers — who, like both Williams and Councilman Culver, is an African-American — asked the Chairman of the License Review Committee whether it was true that, earlier that same day, the Committee had approved an application submitted by the "Cat and Mouse Club."[71] Dennis Cole confirmed that the Committee had done so, but said that the Cat and Mouse Club was owned by a corporation which had only one shareholder, and that there had been a recent change in the identity of that shareholder. He then explained that,

> when ownership changed, or shareholders changed, all [the club owner]

---

[68] *Id*. (emphasis and alteration supplied).

[69] *Id*. at ECF 4.

[70] Doc. no. 21-6 (Dec. 6, 2012 Council Minutes: pages 20-34 of 38), at ECF 5 (alteration supplied).

[71] *Id.*

18

had to do was supply the State and the City with the new owner's information.  He continued that the [Cat and Mouse Club] was already licensed, there was not a new license being granted, that it was just the approval of a [new] shareholder.[72]

Councilman Showers then asked City Attorney Peter Joffrion whether the City would be exposed to liability, if the Council denied plaintiffs' appeal.[73]  Mr. Joffrion responded that, "based upon all that he had heard concerning this matter, his answer would be no."[74]  He added that "there had been more than enough evidence upon which the Council could base its decision to deny the license, if that was what the Council chose to do."[75]

Finally, Councilman Bill Kling asked Peter Joffrion whether the City of Huntsville

had ever had this type of strip-club-type facility come up for consideration before the City Council and the Council had approved, denied, or taken any action, or if this would be the first time for this issue.

Mr. Joffrion [reiterated substantially the same thing he had said at the conclusion of the public comments, and] stated that the City had never approved a license for a strip club, [and] that nudity was not permitted under City ordinances.

President Russell [then] called for the vote on his motion to

---

[72] *Id*. (alterations supplied).

[73] *Id.*

[74] *Id.*

[75] *Id.*

uphold the decision of the Liquor License Review Committee in this matter, and it was unanimously approved by the Council.[76]

## II.  PETITION FOR WRIT OF CERTIORARI

Where, as here, "there is no statutory right of direct appeal from a local government's decision to deny an application for a liquor license, the only proper method of judicial review is by the common-law writ of *certiorari*."  *Phase II, LLC v. City of Huntsville*, 952 So. 2d 1115, 1120 n.3 (Ala. 2006) (citing *Sanders v. City of Dothan*, 642 So. 2d 437, 440 (Ala. 1994)).  The scope of review is limited to the record before this court, and the only issue to be determined is whether to affirm or quash the decision of the City Council.  As the Alabama Supreme Court observed in *Jefferson County v. Berkshire Development Corp.*, 168 So. 2d 13 (Ala. 1964), "[t]he appropriate office of the writ is to correct errors of law apparent on the face of the record.  The trial is not *de novo*, but on the record, and the only matter to be determined is the quashing, or affirmation, of the proceedings brought up for review."  *Id.* at 16 (alteration supplied).

Further, when "reviewing a municipal council's exercise of its legislative discretion to approve or disapprove the issuance of a restaurant liquor license, this Court must apply an 'arbitrary-and-capricious' standard."  *Ex Parte Trussville City*

---

[76] Doc. no. 21-6 (Dec. 6, 2012 Council Minutes:  pages 20-34 of 38), at ECF 5–6 (alterations supplied).

*Council*, 795 So. 2d 725, 727 (Ala. 2001).

The Alabama Supreme Court addressed a factually similar case in 2006.  In

*Phase II, LLC*, *supra*, a plaintiff seeking a liquor license argued that complaints from

community members "and statistics provided by the Huntsville Police Department did

not provide a reasonable justification for the city council to deny the liquor license."

952 So. 2d at 1120.  The following portions of the Court's opinion are instructive:

> The City, on the other hand, argues that the city council's denial
> of the liquor license was not arbitrary and capricious but was justified
> by ample evidence of the potential negative impact of the liquor license
> on the area in which the nightclub was to be located.  *See Ex parte
> Trussville City Council*, 795 So. 2d at 727 (stating that a presumed
> negative impact on the surrounding area is sufficient to support a finding
> that a city council did not act arbitrarily and capriciously in denying a
> liquor license).  At the hearing before the city council, Wyndham Park
> residents, their families, and members of the staff of Wyndham Park
> testified that the proposed nightclub would result in increased traffic,
> compromised public safety, and limits on the residents' freedom of
> movement.  A representative of the VTUP [*i.e.*, "Victory Tabernacle
> United Pentecostal"] Church expressed concern over the effect of the
> proposed nightclub on the church's evening weekend services, the
> amount of increased traffic in the area, and the risk of drunk-driving
> incidents.  The Huntsville Police Department also presented at the
> hearing statistics regarding calls of assistance from lounges with a
> similar capacity, based on "shots fired."
>
> This evidence is sufficient to support the trial court's finding that
> the city council had not acted arbitrarily and capriciously in denying
> Phase II's application for a liquor license.  The city council properly
> considered the detrimental effects of increased traffic on the area of the
> proposed nightclub; the impact of the proposed nightclub on public
> safety; and the general welfare of area residents.  The Huntsville Police

21

Department testified that a liquor lounge would have a detrimental effect on police manpower, particularly on Friday and Saturday nights. The police department also testified that police calls from similar lounges typically occur after 2 a.m. and include complaints of loitering, fighting, littering, and gunfire. These police concerns, coupled with the testimony of both Wyndham Park residents and a representative of the VTUP Church, *created more than reasonable justification for the city council's denial of the liquor-license application*. Therefore, in light of these safety and traffic concerns, we conclude that the city council did not arbitrarily and capriciously deny Phase II's liquor-license application.

*Phase II, LLC*, 952 So. 2d at 1120–21 (alteration and emphasis supplied).

This court also finds that the concerns of community residents, coupled with the statistics presented by Sergeant Mark Roberts, "created more than reasonable justification for the city council's denial of the liquor-license application." *Id.* at 1121. "Alabama municipalities are accorded broad discretion when reviewing a liquor-license application." *Id.* (citing *Ex parte Trussville City Council*, 795 So. 2d at 728).

Plaintiffs' contention that some members of the Council *may have based* their decision on the misconception that Volcano 256 was a "strip club" is speculative. Even assuming for the sake of discussion that Councilman Kling's comment immediately prior to the vote is evidence of "confusion and error" on *his part*,[77] it certainly is not sufficient to carry plaintiffs' burden of proof. Absent more

---

[77] Doc. no. 29 (Response to Motion for Summary Judgment), at 17.

22

compelling evidence, the court cannot find that, as a matter of law, the Council's decision was arbitrary and capricious.

### III. RACIAL DISCRIMINATION CLAIM

Plaintiffs allege that they were "subject[ed] to different and less favorable treatment in obtaining permits and licenses . . . than similarly situated White business owners."[78]  Their claims under 42 U.S.C. §§ 1981 and 1983 merge, as "section 1981 can provide no broader remedy against a state actor than section 1983." *Busby v. City of Orlando*, 931 F.2d 764, 771–72 n.6 (11th Cir. 1991).

A municipality may be held accountable under 42 U.S.C. §§ 1981 and 1983 for the conduct of a group of governmental actors only when plaintiffs show that execution of an official "policy" or "custom" effectively was the cause of the injury complained of.  *Monell v. Department of Social Services of New York*, 436 U.S. 658, 694 (1978).[79]

Plaintiffs base their race discrimination claim, in part, on the actions of Sergeant Roberts.[80]   Daryl Williams admitted in his deposition, however, that

---

[78] Doc. no. 7 (Amended Complaint), ¶ 34 (alteration supplied).

[79] The term *policy* has been defined as "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town Lake of Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997).  The term *custom*, on the other hand, is defined as "a practice that is so settled and permanent that it takes on the force of law." *Id.* (citing *Monell*, 436 U.S. at 690-91).

[80] Doc. no. 7 (Amended Complaint), ¶¶ 15–17.

23

Sergeant Roberts was not acting in accordance with a policy or custom of the City.

> Q:    Do you believe that [Roberts] was acting in accordance with any existing customs of the City of Huntsville in [his actions]?
>
> A:    No.  I think he was — I think he had a mission to try to sabotage me.
>
> Q:    Are you aware of any past practices of the City of Huntsville that he might have been acting in accordance with by doing what you described?
>
> A:    No. . . . .[81]

Williams also concedes that the members of the City's License Review Committee did not discriminate against him.

> Q:    With respect to your belief that you were discriminated against, do you believe that you were discriminated against by the liquor license review committee?
>
> A:    No.[82]

Accordingly, the only governmental action for which the City might be held liable is the Council's unanimous vote sustaining the License Review Committee's denial of plaintiffs' application.

The Supreme Court observed in *Pembaur v. Cincinnati*, 475 U.S. 469 (1986), that "a municipality may be liable under 1983 for a single decision by its properly

---

[81] Doc. no. 28-2 (Williams Deposition), at 171–73 (alterations supplied).

[82] *Id.* at 135.

24

constituted legislative body — whether or not that body had taken similar action in the past or intended to do so in the future — because even a single decision by such a body unquestionably constitutes an act of official government policy." *Id*. at 480 (citing *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), and *Owen v. City of Independence*, 445 U.S. 622 (1980)). Even so, plaintiffs still must show that the City Council's decision was motivated by a racially-discriminatory animus. *See Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1270 (11th Cir. 2004).

In order to state a *prima facie* case of race discrimination under either § 1981 or § 1983, plaintiffs must establish:  (1) that plaintiff Daryl Williams is a member of a racial minority; (2) that the City Council intended to discriminate against him on the basis of his race; and (3) "that the discrimination concerned one or more of the activities enumerated in the statute." *Id*.  It is undisputed that Williams is a member of a racial minority, and that plaintiffs have alleged discrimination concerning an activity enumerated in § 1981:  *i.e.*, the right to contract.[83]  Thus, the "issue central to resolution of [plaintiffs' claims] . . . is whether the plaintiffs have alleged facts sufficient to support the second prong — that the . . . defendants engaged in intentional racial discrimination." *Id*. (alterations supplied) (citing *General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375, 391 (1982) (holding that

---

[83] *See* doc. no. 7 (Amended Complaint), ¶ 31 (citing language from 42 U.S.C. § 1981).

claims based upon § 1981 "can only be violated by *purposeful* discrimination")
(emphasis supplied)).

Plaintiffs allege that the City engaged in intentional racial discrimination when
the Council subjected Daryl Williams to "different and less favorable treatment in the
obtaining of permits and licenses . . . than similarly situated White business
owners."[84]  As the Eleventh Circuit held in *Jackson v. BellSouth*, however:

> When comparing similarly situated individuals to raise an inference of
> discriminatory motivation, the individuals must be similarly situated in
> all relevant respects besides race, *Jones v. Bessemer Carraway Medical
> Center,* 137 F.3d 1306, 1311 (11th Cir. 1998) (involving Title VII
> claim), since "[d]ifferent treatment of *dissimilarly* situated persons does
> not violate" civil rights laws.  *E & T Realty  v. Strickland,* 830 F.2d
> 1107, 1109 (11th Cir. 1987) (addressing equal protection claim).

372 F.3d at 1273–74 (alteration and emphasis in original).

Plaintiffs have pointed to the following individuals whom they believe were
similarly situated, but were treated more favorably:  the Caucasian husband and wife
who formerly owned the Silver Dollar Lounge ("the couple"); and, the Caucasian
owner of the Cat and Mouse Club.[85]  The question is whether these individuals are
"similarly situated in all relevant respects besides race."  *Id.*

Plaintiffs contend that the City treated Williams's application for a liquor

---

[84] Doc. no. 7 (Amended Complaint), at ¶ 34.

[85] Doc. no. 29 (Response to Motion for Summary Judgment), at 16, 18.

license differently from the couple's original application for a license in the 1970s, and subsequent renewals of that license.[86]  The renewals are not relevant, however. Renewal of a liquor license does not require an application; it requires only that the owner pay a fee.  *See* HUNTSVILLE, ALA., ORDINANCE NO. 12-365, § 16-45 (2012). Plaintiffs suggest that *not suspending* the couple's license when it was up for renewal is somehow tantamount to *granting* a liquor license, but the *suspension process* is inherently different from the *application process*.  *Compare* HUNTSVILLE, ALA., ORDINANCE NO. 11-654, § 3-91 (permitting the License Review Committee to suspend a license if the owner violates an ordinance or law, or if the owner conducts business "in a manner prejudicial to the welfare . . . of the public.") *with id.* at § 3-81 (listing nine factors, "among others and without limitation," the License Review Committee should consider in granting applications).  The City's treatment of the couple's license renewals, therefore, is not relevant to the plaintiffs' § 1981 claim.

The City's treatment of the couple's original liquor license *application* in the decade of the 1970s is arguably relevant.  Several factors point to the couple and Williams being similarly situated in that respect.  First, the premises are the same.[87] Second, the type of license sought,  "Lounge Retail (With Entertainment)," is the

---

[86] *Id.*

[87] Doc. no. 28-3 (Williams Deposition), at 112.

same.[88]   Third, the business that was conducted at the Silver Dollar Lounge, and the

business that would have been conducted at Volcano 256, *if* its application had been

granted, is the same (an adult lounge with female dancers).[89]

      Nevertheless, the City argues that the couple and Williams are not similarly

situated because the couple applied for their license "approximately thirty years

ago."[90]   They contend that "[t]ime alone is sufficient to establish different

circumstances."[91]   The City failed to provide support for its argument, however, and

this court was unable to find binding authority on the issue in the decisions of either

Alabama courts or the Eleventh Circuit.  Even so, a recent case decided by the United

States Court of Appeals for the First Circuit is persuasive.

      In *Snyder v. Gaudet*, 756 F.3d 30 (1st Cir. 2014), the City of Waltham,

Massachusetts, issued a citation to a landowner for violation of a city land-use

---

[88]   *See* doc. no. 21-1 ("City of Huntsville Alcoholic Beverage License Supplemental Application"), at ECF 29.  *See also*, *e.g.*, *id*. at ECF 26 ("City of Huntsville, Alabama Supplemental Privilege License Application Approval for Alcoholic Beverage"), stating in the "REMARKS/COMMENTS" portion at the bottom of the page:

      The applicant would like for the City of Huntsville to approve a Lounge Retail Liquor with entertainment license at this location.  This location held a 2010 license for this same classification under the name R G Entertainment Inc. #8692 d/b/a Silver Dollar.

[89] Doc. no. 28-3 (Williams Deposition), at 114.

[90] Doc. no. 27 (Summary Judgment Brief), at 25.

[91] *Id.* (alteration supplied).

ordinance.  *Id.* The landowner, pursuant to a § 1981 claim against the city, pointed to the previous owner of the property as a "similarly situated, but differently treated, comparator."  *Id.* at 34.  The court held that "the most reliable comparisons are likely to be from roughly the same time frame, particularly in the land-use context, where *differential treatment following a time lag . . . may indicate a change in policy rather than an intent to discriminate*."  *Id.* at 35 (citing *Cordi-Allen v. Conlon*, 494 F.3d 245, 253 (1st Cir. 2007)) (emphasis supplied, internal quotation marks omitted, alteration in original).

Here, the supposed similarly-situated comparators applied for their liquor license some thirty or more years ago, creating a temporal difference between applications that is substantially greater than the thirteen-year difference addressed in *Snyder*.  During the intervening decades, numerous factors affecting the acceptance and denial of liquor license applications undoubtedly have changed — including, among other considerations, the makeup of the city council, city policies, law enforcement strategies, crime statistics, zoning ordinances, licensing ordinances, communities, neighborhoods, and the application process itself.  In light of such inevitable differences, it defies logic to assert that liquor license applicants separated by more than thirty years are similarly situated *in all relevant respects*. *See Bellsouth*, 372 F.3d at 1273.  Accordingly, the court finds that the owners of the Silver Dollar

29

Lounge and Daryl Williams are *not* "similarly situated in all relevant respects." *Id.*

The owner of the Cat and Mouse Club is not a suitable comparator, either. First, that Club's sole shareholder did not apply for the same type of liquor license. Whereas plaintiffs applied for a license that included "entertainment," the Cat and Mouse Club did not.[92]  Moreover, the Cat and Mouse Club's owner was not applying for a *new* license, but was merely seeking approval from the City as a new shareholder.[93]  As the Chairman of the License Review Committee explained during the Council's second hearing, the process for approving a new shareholder is not similar to the process for approving new applications for a liquor license, as the former is limited to an investigation only of the *applicant*, whereas investigations conducted during the process of approving new applications are far more comprehensive.  *Compare* HUNTSVILLE, ALA., ORDINANCE NO. 11-654, § 3-53 *with id.*, § 3-81.  For those reasons, the owner of the Cat and Mouse Club and Daryl Williams are not "similarly situated in all relevant respects." *Bellsouth*, 372 F.3d at 1273.

Plaintiffs have thus failed to identify any non-minority liquor license applicants who were similarly situated to Williams.  The City, however, has identified similarly

---

[92] Doc. no. 28-3 (Williams Deposition), at 142.

[93] Doc. no. 21-6 (Dec. 6, 2012 Council Minutes: pages 20-34 of 38), at ECF 5.

situated Caucasian applicants who were treated the same as Williams:[94] that is, their applications were denied for reasons similar to those raised by the License Review Committee and by the Council in this case.[95] The Caucasian applicants identified by the City were denied a liquor license with "entertainment," in the form of dancing, because community members objected to the license.[96] "This undercuts any suggestion that race was a motivating factor for the defendant's actions." *Id.* at 1274.

Thus, plaintiffs have failed to raise a *prima facie* presumption of intentional discrimination on the part of the City.

## IV. CONCLUSION AND ORDERS

In accordance with the foregoing, the City of Huntsville's motion for summary judgment is GRANTED, and it is ORDERED that all claims asserted in the plaintiffs' amended complaint be, and the same hereby are, DISMISSED *with prejudice*. Costs are taxed to plaintiffs. The Clerk is directed to close this file.

---

[94] Doc. no. 28-2 (Roberts Deposition), at 93.

[95] *Id.*

[96] *Id.* The City also points to another supposed similarly situated applicant, but that applicant was applying for a liquor license for a music venue, not an adult lounge with dancing. *Id.* That applicant therefore is *not* similarly situated to Williams.

**DONE** and **ORDERED** this 29th day of September, 2014.

United States District Judge